UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

CAVCON INC.,
a West Virginia corporation,

          Plaintiff,

v.                                Civil Action No. 2:07-0044

ENDRESS + HAUSER, INC.,
an Indiana corporation,
TODD LUCEY, an individual,
FRED CAPPELLI, an individual,
L.H. BOLEKY CO., a Pennsylvania
corporation, and JOHN PLANITZER,
an individual,

          Defendants.


                    MEMORANDUM OPINION AND ORDER


          Pending in this eleven-count action for breach of

contract, tortious interference and related claims are the joint

motion of all the defendants for summary judgment and the motion

of the plaintiff for summary judgment with respect to Count I

only, each filed on December 19, 2007.[1]

_____

          [1] Because it was prior to the filing of a responsive
pleading, it was as a matter of right that plaintiff filed its
amended complaint, on January 24, 2007, to correct the
inappropriate inclusion of Endress + Hauser Systems & Gauging
Inc., an improperly-named defendant, and replace it with the
intended defendant, Endress + Hauser, Inc.  The amended complaint
is the operative document.

I.

A.   <u>The Agreement between Cavcon and Endress</u>

On February 11, 1991, plaintiff Cavcon Inc. ("Cavcon"), a West Virginia corporation, entered into a sales representative agreement ("agreement") with defendant Endress + Hauser, Inc. ("Endress"), an Indiana corporation, to be its exclusive, independent sales representative in distributing Endress' industrial instrumentation products in a territory that included a portion of West Virginia that appears to cover all but the northern panhandle of the state ("West Virginia territory"). (Compl. ¶¶ 1-2, 7; Answer ¶¶ 2, 7; Agreement ¶ 1(a), attached as Ex. 1 to Defs.' Reply to Resp. to M.S.J.; Lucey Decl. ¶ 6, attached as Ex. 8 to Defs.' M.S.J.; Planitzer Depo. at 33, attached as Ex. 1 to Defs.' M.S.J.).  The agreement authorized Cavcon to sell products made by Endress.  (Agreement ¶ 14, attached as Ex. 1 to Defs.' Reply to Resp. to M.S.J.).  Endress paid Cavcon a commission upon all net sales of Endress' specified products within Cavcon's territory.  (<u>Id.</u> ¶ 5).

The agreement contained the following relevant paragraph:

2

13.  **Term of Agreement**

(a) This agreement shall continue in force until terminated by either party, with or without cause, by the giving of thirty (30) days prior written notice of the intention to terminate this agreement.

(b) In the event of termination of this agreement in accordance with 13(a), Company [Endress] agrees to credit commission to Representative [Cavcon] for orders resulting from Representative's quotations, according to the following schedule:

For orders transmitted by Representative or customers in Representative's territory and accepted by Company within thirty (30) days after the effective termination date, the full commission shall be credited.

For orders similarly transmitted by Representative or customers in Representative's territory and accepted by Company between 31 and 60 days after the effective termination date, ½ of the commission shall be credited.

No commission shall be paid on orders to be shipped more than one (1) year after termination.

For these provisions to apply, copies of all outstanding quotations up to the date of termination shall be deposited with Company at that time. Company's acceptance of such orders shall not be unreasonably withheld.

(**Id.** ¶ 13).


B.  **Cancellation of the Agreement**


On October 30, 2006, Endress provided notice of its intent to terminate the agreement, effective November 1, 2006.

3

(10-30-06 Cancellation Addendum, attached as Ex. 1 to Pl.'s

M.S.J.). The cover letter and accompanying addendum to the

contract cancelling the agreement ("cancellation addendum") cited

paragraph 13 of the original agreement after providing as

follows:

> Afer much consideration, Endress + Hauser has elected
> to terminate CAVCON, Inc. as our representative in the
> territory defined:

> * * *

> [numerical descriptions omitted]

> We appreciate your efforts on our behalf and wish you
> and your company success in the future. <u>Your effective
> termination date is November 1, 2006.</u> [boldfaced]

> We will continue to honor orders resulting from your
> quotations and credit payment of sales commissions
> outlined in section 13 B of our representative
> agreement below.

> * * *

(<u>Id.</u>). Following the boldface articulation of paragraph 13(b),

the addendum contained signature blocks for Todd Lucey ("Lucey"),

as general manager of Endress, and Jack Vaughan ("Vaughan"), as

president of Cavcon; however, neither of their signatures were

affixed to the document. (<u>Id.</u>). Vaughan did not sign and return

the cancellation addendum to Endress at the advice of his lawyer.

(Vaughan Depo. at 88, 180-181, attached as Ex. 4 to Defs.'

M.S.J.). It is undisputed, however, that Vaughan received the

cancellation addendum via Federal Express on behalf of the
plaintiff on October 31, 2006.  (Id. at 87).

Frank Buchy ("Buchy"), as manager of the relevant West
Virginia territory for Endress, testified that Endress decided to
replace Cavcon because Vaughan did not provide any written plan
to grow its West Virginia territory despite Endress' requests to
provide one.  (Buchy Depo. at 69, attached as Ex. 12 to Defs.'
M.S.J.).

C.  Post-termination Conduct Mandated by Agreement

On November 15, 2006, an e-mail was sent to potential
Endress customers by Buchy announcing Endress' appointment of
Pennsylvania corporation, L.H. Boleky Co. ("Boleky"), as
industrial municipal representative for the West Virginia
territory formerly occupied by Cavcon.  (11-15-06 Buchy e-mail,
attached as Ex. 11-F to Defs.' M.S.J.).  In the e-mail, the
effective date of the appointment was listed as December 1, 2006.
(Id.).

Boleky did not begin as the sales representative in the
West Virginia territory, formerly occupied by Cavcon, until after
December 1, 2006.  (Lucey Decl. ¶ 7, attached as Ex. 8 to Defs.'

M.S.J.).  Cavcon "continued to place orders with [Endress] during the month of November 2006 and beyond that time." (Vaughan Depo. 47-48, attached as Ex. 4 to Defs.' M.S.J.).  Vaughan acknowledged that Cavcon received 100% commissions for all orders placed following his receipt of the termination notice.  (<u>Id.</u>).

The obligation to pay these post-termination commissions was conditioned upon Cavcon meeting the requirement of the agreement that "copies of all outstanding quotations up to the date of termination shall be deposited with Company at that time."  (Agreement ¶ 13(b), attached as Ex. 1 to Defs.' Reply to Resp. to M.S.J.).  Although Cavcon never sent Endress the outstanding quotations, (Vaughan Depo. 177-179, attached as Ex. 4 to Defs.' M.S.J.), Endress nevertheless paid Cavcon full commissions for all orders placed.  (Lucey Decl. ¶ 7, attached as Ex. 8 to Defs.' M.S.J.).

D.  <u>Boleky's Background</u>

On January 1, 1996, John Planitzer ("Planitzer") purchased Boleky and has served as president and sole owner of Boleky during the relevant time period.  (Compl. ¶¶ 5-6; Answer ¶¶ 5-6; Planitzer Depo. at 9, attached as Ex. 1 to Defs.'

6

M.S.J.).  When he purchased Boleky, the company's sales territory for all of its suppliers included "Western Pennsylvania, West Virginia, the border counties of Ohio, and the counties of Allegheny and Garrett in Maryland."  (Id.).  Boleky did not, however, sell Endress products in those territories at that time. (Id.).

Boleky has had steady sales growth since Planitzer purchased it in 1996.  (Planitzer Depo. at 9, attached as Ex. 1 to Defs.' M.S.J.).  In 1996, the company had sales of $2.1 million, and in 2006, Boleky's annual sales reached $5.1 million. (Id. at 9-10).

Sometime in 2002, Joe Forrester ("Forrester"), then principal owner of Staples & Associates, Inc. ("Staples"), which was the Endress independent sales representative for Western Pennsylvania at the time, approached Planitzer about Boleky purchasing Staples' product lines.  (Id. at 20; 11-21-02 Sherenian e-mail, attached as Ex. 8-B to Defs.' M.S.J.). Forrester and his son-in-law, Fred Cappelli ("Cappelli"), then employed by Staples, approached Endress to solicit its support for Staples' efforts to find a suitable merger partner and specifically mentioned Boleky, to which Endress agreed.  (10-10-02 Lucey Ltr. to Forrester and Cappelli, attached as Ex. 8-A to

7

Defs.' M.S.J.; 11-21-02 Sherenian e-mail, attached as Ex. 8-B to Defs.' M.S.J.).

Effective March 1, 2003, Boleky purchased Staples' product lines, including the Endress territory for Western Pennsylvania and the northern panhandle of West Virginia. (Planitzer Depo. at 19, 22-23, 33, attached as Ex. 1 to Defs.' M.S.J.). As part of the acquisition of Staples, Planitzer hired Forrester to be an employee of Boleky for three years. (Id. at 21). Around the time of the acquisition, Cappelli was hired as area vice president for Endress, which included supervision of all of West Virginia. (Id. at 29; 04-05-06 Cappelli e-mail to Vaughan, attached as Ex. 5 to Defs.' M.S.J., identified as EH 0945 and Ex. 29 of Vaughan Depo.).

During the discussions between Boleky and Staples in 2002, Michael Sherenian of Endress inquired of Planitzer's interest in Boleky serving as Endress' sales representative for the rest of West Virginia, if the territory were to become available. (Id. at 52-53; 11-21-02 Sherenian e-mail, attached as Ex. 8-B to Defs.' M.S.J.). In 2003, Planitzer again spoke with Sherenian, along with his new employee, Forrester, about working the rest of the West Virginia territory, if the possibility were to arise. (Planitzer Depo. at 53, attached as Ex. 9 to Defs.'

8

M.S.J.).  Planitzer did not, however, initiate these
conversations with Sherenian regarding the takeover of the rest
of Endress' West Virginia territory.  (Id. at 52-53, 17-21).

Knowing he was about to work for Endress, Cappelli sold
his shares of Staples to Forrester.  (Cappelli Depo. at 12,
attached as Ex. C to Pl.'s Resp. to M.S.J.).  When asked whether
he received any compensation for the sale of Endress' line by
Boleky, Cappelli testified that he was supposed to receive "some
compensation for any overage of certain sales goals" by Boleky of
Staples' former product line, but he did not remember whether he
actually received any money or the details of the contractual
arrangement.  (Id. at 12-13).

In 2003, Staples and Boleky combined to produce
$785,000 in orders for Endress' products in the Western
Pennsylvania territory.  (Lucey Decl. ¶ 5, attached as Ex. 8 to
Defs.' M.S.J.).  For 2007, Boleky was on pace to achieve
$2,200,000 in orders for Endress' products in Western
Pennsylvania.  (Id.).

### E.  Cavcon's Sales Figures

In 2001, Cavcon secured $591,112 in orders for Endress'

9

products against a goal of $647,602, which represents 86.64%
toward attainment of the goal. (Vaughan Depo. at 142, attached as
Ex. 4 to Defs.' M.S.J.; Selby Report, Ex. 7 to Vaughan Depo.).
In 2002, Cavcon secured $511,318 in orders for Endress' products
against a goal of $627,413, which represents 81.50% attainment.
(Id.).  In 2003, Cavcon's orders for Endress' products fell to
$389,886 against a goal of $690,000, which represents 56.61%
attainment.  (Id.).  Cavcon's 2004 orders for Endress' products
were $527,220 and exceeded the $500,000 target for that year.
(Id.).

On December 17, 2004, Cappelli, as area vice president
for Endress, whose area included West Virginia, (Compl. ¶ 4;
Answer ¶ 4), sent Cavcon its 2005 sales target goal of $575,000.
(Vaughan Depo. at 142, attached as Ex. 4 to Defs.' M.S.J.; Selby
Rpt., Vaughan Depo. Ex. 7, attached as Ex. 5 to Defs.' M.S.J.).
Cavcon made sales of $674,000 in 2005 far exceeding the annual
goal.  (Lucey Depo. at 29, attached as Ex. B to Pl.'s Resp. to
M.S.J.; 06-19-06 Vaughan Ltr. to Buchy, attached as Ex. A to
Pl.'s Resp. to M.S.J., identified as EH 36).

10

### F. <u>Endress' Comparison Between Boleky and Cavcon</u>

At the end of November 2006, Cavcon was, according to Vaughan, at 99% of its $790,000 annual target, (Vaughan Depo. at 147, attached as Ex. 4 to Defs.' M.S.J.), which represented a 30.3% growth from 2001.  During that same time, Endress grew from $54,000,000 in orders in the United States to $109,700,000, (Lucey Decl. ¶ 8, attached as Ex. 8 to Defs.' M.S.J.), which represents a growth rate of 103%.  From 2003 to 2007, Boleky's Endress orders in Western Pennsylvania grew by approximately 180% ($785,000 in 2003 to $2,200,000 in 2007).  (<u>Id.</u> ¶ 5).

### G.   <u>Five-year Plan Requested from Cavcon</u>

On January 31, 2005, Cappelli sent Vaughan market data on West Virginia based on a market research study performed by a consultant from Rasmusson & Wiley retained by Endress.  (Vaughan Depo. at 143, attached as Ex. 4 to Defs.' M.S.J.; Selby Rpt., Vaughan Depo. Ex. 7, attached as Ex. 5 to Defs.' M.S.J.; 01-31-05 Buchy e-mail to Vaughan, Vaughan Depo. Ex. 25, attached as Ex. 5 to Defs.' M.S.J.; Integr. Pretr. Ord. at 10, 16).  Based on the data, Endress believed that Cavcon was far below its market potential.  (<u>Id.</u>).  In late 2005 or early 2006, Endress requested

11

Cavcon prepare a five-year plan for the West Virginia territory in an effort to reach certain sales growth goals based upon the market research study.  (Integr. Pretr. Order at 10, 16).

In objecting to the new push for a greater market share, Vaughan cited the "horrendous business climate in West Virginia" as the reason he did not believe the new suggested goals for 2006 were attainable.  (Vaughan Depo. at 141-142, attached as Ex. 4 to Defs.' M.S.J.; Vaughan Ltrs., attached as Ex. A to Pl.'s M.S.J.).  Vaughan had long attempted to make Endress aware of what he considered to be a difficult business climate in its West Virginia territory with letters to the company in 1999, 2000 and 2004.  (Vaughan Ltrs., attached as Ex. A to Pl.'s Resp. to M.S.J.).  Lucey testified that he threw away some of the articles sent by Vaughan regarding the business climate in West Virginia.  (Lucey Depo. at 28, attached as Ex. B to Pl.'s Resp.).  Concerned about the growth goals in the market study, Vaughan discussed the matter with Endress personnel in an effort to set what he described as a more reasonable goal.  (Vaughan Depo. at 141-142, attached as Ex. 4 to Defs.' M.S.J.).

## H.  <u>Endress' Representative Council</u>

Endress, as a manufacturer of industrial instrumentation products, sells its products through a direct sales force and through its network of independent contractors such as Boleky and Cavcon.  (Defs.' Memo. in Supp. of M.S.J. ¶ 21).  In order to facilitate the flow of information about its products to and from its contractors, Endress created the "Rep Council."  (<u>Id.</u> ¶ 22).[2]  Each of Endress' six regions sends a designated sales representative as its Rep Council member to occasional meetings on a rotating three-year basis.  (Lucey Decl. ¶ 6, attached as Ex. 8 to Defs.' M.S.J.).  The Rep Council member may solicit information from the contractors before the meetings and relay information to the contractors after the meeting. (Planitzer Depo. at 16-20, 56, 58, attached as Ex. 1 to Defs.' M.S.J.).  The Rep Council focuses on products for sale, product delivery, product development, and marketing.  (<u>Id.</u> at 56-57). It does not deal with representative contracts or territories or other business matters.  (<u>Id.</u> at 58).

---

[2]  Plaintiff does not dispute these two sentences extracted solely from defendants' memorandum, which are without other support in the evidentiary record.

Endress views the council members as spokespersons for the independent sales representatives in their respective territories.  (Lucey Decl. ¶ 6, attached as Ex. 8 to Defs.' M.S.J.).  Council members do not speak on behalf of an individual sales representative from a given territory about any contractual or commercial terms.  (Id.).  Endress sees the purpose of the council as an opportunity to share information between the sales representatives and the manufacturer concerning market conditions for the Endress products, sales information, Endress' initiatives and product launches, and related matters.  (Id.).

In 2005, Planitzer became the Rep Council member for Endress' Northeast region which included West Virginia.  (Compl. ¶ 8; Answer ¶ 8; Planitzer Depo. at 55-56, attached as Ex. 1 to Defs.' M.S.J.).  Cavcon's representative on the Rep Council was Planitzer.  (See id.).

## I.  Inquiries of Planitzer Regarding Boleky's interest in West Virginia

In October 2005, while waiting for a flight at the Indianapolis airport after a Rep Council meeting, Cappelli, then serving as area vice president for Endress, asked Planitzer whether he would be interested in the West Virginia territory, if

14

it became available.  (Planitzer Depo. at 58, 60-61, attached as
Ex. 1 to Defs.' M.S.J.).  Cappelli brought up the question while
he and Planitzer were carrying on a conversation about business
generally.  (Id. at 62-63).  Planitzer acknowledged it was a
"private conversation," and he "kept it private."  (Id. at 67).

On November 10, 2005, Frank Buchy, the Endress
territory manager for Pennsylvania and West Virginia and who
reported to Cappelli, e-mailed Planitzer regarding Planitzer's
interest in the West Virginia territory as a follow up to
Planitzer's brief exchange with Cappelli.  (11-10-05 Buchy e-mail
to Planitzer, attached as Ex. 11-A to Defs.' M.S.J.).

While attending a national sales meeting in San Diego,
Vaughan confronted Planitzer about the rumor that he may be
taking over the West Virginia territory. (Planitzer Depo. at 67-
68, attached as Ex. 1 to Defs.' M.S.J.; Vaughan Depo. at 62,
attached as Ex. 4 to Defs.' M.S.J.).  Vaughan asked Planitzer
whether Endress had spoken to him about the West Virginia
territory, which Planitzer confirmed.  (Id.).

At some point after March 2006, Endress contacted
Planitzer about taking over the West Virginia territory.
(Planitzer Depo. at 73, attached as Ex. 1 to Defs.' M.S.J.).  At

15

that time, Endress asked Planitzer to have Boleky provide a business plan showing what Boleky would do for the territory if it became available.  (Id.).

On May 26, 2006, Planitzer sent Buchy a one and one-half page letter via e-mail outlining in general terms how Boleky would attempt to achieve Endress' five-year target in West Virginia.  (Planitzer Depo. at 74-75, 78, 82, attached as Ex. 1 to Defs.' M.S.J.; Planitzer Decl. ¶ 4, attached as Ex. 9-A to Defs.' M.S.J.).  On June 11, 2006, Buchy e-mailed Planitzer to thank him for his interest in the West Virginia territory and solicited additional information from Planitzer as to how he would develop the territory.  (Buchy Decl. ¶ 6, attached as Ex. 11-D to Defs.' M.S.J.).  Planitzer responded on June 26, 2006 with a modified and final version of the business plan. (Planitzer Depo. at 80, attached as Ex. 1 to Defs.' M.S.J.; Planitzer Decl. ¶ 5, attached as Ex. 9-B to Defs.' M.S.J.).

J. Correspondence between Vaughan and Endress Managers

On January 6, 2006, Buchy e-mailed Vaughan to convey that Cavcon's 2006 sales target for Endress products was $790,000.  (Vaughan Depo. at 147-149, attached as Ex. 4 to Defs.'

16

M.S.J.; 06-06-06 Buchy to Vaughan e-mail, Vaughan Depo. Ex. 26, attached as Ex. 5 to Defs.' M.S.J.).  In response, Vaughan believed that the 28% increase over the prior year's target was an impossible goal.  (06-06-06 Buchy to Vaughan e-mail, Vaughan Depo. Ex. 26, attached as Ex. 5 to Defs.' M.S.J.).  On January 9, 2006, when Vaughan and Buchy met to address Cavcon's concerns regarding what Vaughan found to be an unrealistic sales target for 2006, Vaughan also questioned the third-party research regarding Endress' market-share data. (Vaughan Depo. at 149, attached as Ex. 4 to Defs.' M.S.J.; Selby Depo. Ex. 8, Cavcon 0484-0485).

On March 23, 2006, Vaughan e-mailed Buchy requesting answers to his unanswered questions from the January meeting. (Vaughan Depo. at 150-151, attached as Ex. 4 to Defs.' M.S.J.; Vaughan Depo. Ex. 27, attached as Ex. 5 to Defs.' M.S.J.).  On April 3, 2006, having received no response, Vaughan again e-mailed Buchy under the subject, "I need answers to questions that are weeks and months old!!!!!!!!!!!!!!!!!!!!!!".  (Vaughan Depo. at 151-152, attached as Ex. 4 to Defs.' M.S.J.; Vaughan Depo. Ex. 28, attached as Ex. 5 to Defs.' M.S.J.).  Again, Vaughan asked Buchy about the "bogus third party research" concerning the

market for Endress products in the West Virginia territory.
(Id.).

In an e-mail on April 5, 2006, Cappelli challenged
Vaughan's tone as demonstrating a lack of respect for Endress'
management team.  (Vaughan Depo. at 152, attached as Ex. 4 to
Defs.' M.S.J.; 04-05-06 Cappelli e-mail to Vaughan, Vaughan Depo.
Ex. 29, attached as Ex. 5 to Defs.' M.S.J.).  Cappelli further
noted that Cavcon was at 73% of its target through March and
stated, "Jack, your time and energy would be much better spent on
selling, not complaining."  (Id.).  Cappelli reminded Vaughan
that Endress' goal for the United States was 10% market share by
2011.  (Id.).  Cappelli then asked, "[w]hat is Cavcon doing to
prepare to meet this challenge?".  (Id.).

On April 6, 2006, Buchy responded to Vaughan's issues
and concerns as well.  Buchy reiterated Endress' desire to
support and help Vaughan find a way to achieve Cavcon's sales
goals.  (Vaughan Depo. at 153, attached as Ex. 4 to Defs.'
M.S.J.; 06-06-06 Buchy e-mail to Vaughan, Vaughan Depo. Ex. 30,
attached as Ex. 5 to Defs.' M.S.J.).  The market data that
Endress purchased showed Cavcon at a 2.2% market share.  (06-06-
06 Buchy e-mail to Vaughan, Vaughan Depo. Ex. 30, attached as Ex.
5 to Defs.' M.S.J.).  Endress' goal was to expand Cavcon's market

share to 10% by 2011.  (Id.).

That same day on April 6, 2006, Vaughan was contrite in his responsive e-mail to Cappelli and Buchy, apologizing if his persistence was perceived as disrespectful.  (06-06-06 Vaughan e-mail to Buchy and Cappelli, attached as Ex. A to Pl. Resp. to M.S.J.).  Vaughan stated "[t]he 10% market share by 2011 is some what aggressive but we will give it a shot."  (Id.).

In April 2006, Vaughan retained Flow Research, Inc. to put together a market report for Cavcon.  (Vaughan Depo. at 159, attached as Ex. 4 to Defs.' M.S.J.; Selby Depo. Ex. 9).  On May 4, 2006, Flow Research Inc. provided Cavcon with an estimate of the value of the industrial instrumentation market for West Virginia in 2005 based on actual sales, not market potential.  (Vaughan Depo. at 77, 163-164, attached as Ex. 4 to Defs.' M.S.J.; Vaughan Depo. Ex. 35, attached as Ex. 5 to Defs.' M.S.J.).  Todd Lucey, Endress' general manager, discounted the marketing research furnished by Vaughan because of the different methodology used by that study.  (Compl. ¶ 3; Answer ¶ 3; Lucey Depo. at 43, attached as Ex. B to Pl.'s Resp. to M.S.J.).

On May 5, 2006, Vaughn sent a certified letter to Lucey concerning a rumor that Endress was considering terminating

19

Cavcon's agreement and awarding its territory to an out-of-state entity.  (Vaughan Depo. at 164-165, attached as Ex. 4 to Defs.' M.S.J.; Vaughan Depo. Ex. 36, attached as Ex. 5 to Defs.' M.S.J.).

    On May 15, 2006, Buchy spoke with Vaughan regarding the rumor.  (Vaughan Depo. at 166, attached as Ex. 4 to Defs.' M.S.J.; Vaughan Depo. Ex. 37, attached as Ex. 5 to Defs.' M.S.J.).  Buchy then e-mailed a summary of this conversation to Lucey and Cappelli in which he reported that he advised Vaughan of the following: (1) it was apparent that Vaughan provided only problems rather than solutions; (2) Endress' goal was to get 10% market share in all territories by 2010; (3) Buchy's job consisted of evaluating the region and its performance and considering all options in all territories including possible sales representative replacements; (4) a replacement for the West Virginia territory was a possibility, not a probability, and that he had not made any decisions as of that moment to replace Cavcon in the territory but it was indeed under consideration given the problems and challenges that Vaughan had presented to Endress. (05-15-06 Buchy e-mail to Lucey, attached as Ex. A to Pl.'s Resp. to M.S.J., identified as EH 0051-0052).

That same day, May 15, 2006, Vaughan wrote a letter to Lucey about his conversation with Buchy.  (05-15-06 Vaughan Ltr. to Lucey, attached as Ex. A to Pl.'s Resp. to M.S.J.).  Vaughan indicated that he was convinced that Endress was courting Planitzer to take over Cavcon's territory.  (Id.).  In his letter, Vaughan requested a meeting with Lucey.  (Id.).

On May 25, 2006, Buchy, Cappelli and Vaughan scheduled a teleconference for May 31, 2006 to discuss the concerns Vaughan expressed to Lucey.  (Vaughan Depo. at 169, attached as Ex. 4 to Defs.' M.S.J.).

Following that teleconference, Buchy sent Vaughan a letter dated June 2, 2006, via email on June 6, 2006, summarizing his interpretation of the conversation.  (Id. at 171-172, attached as Ex. 4 to Defs.' M.S.J.; Vaughan Depo. Exs. 43-44; 06-02-06 Buchy Ltr. to Vaughan, attached as Ex. A to Pl.'s Resp. to M.S.J.).  In Buchy's transmittal e-mail to Vaughan attaching the letter, he reiterated his expectation of receiving Cavcon's five-year plan.  (06-06-06 Buchy e-mail to Vaughan, Vaughan Depo. Ex. 43, attached as Ex. 5 to Defs.' M.S.J.).  In the attached letter, Buchy explained that he and Cappelli were accountable for the continued growth, health and success of their assigned area.  (06-06-06 Buchy Ltr. to Vaughan, Vaughan Depo. Ex. 44, attached

21

as Ex. 5 to Defs.' M.S.J.).  As a result, Buchy explained they are constantly evaluating their sales channels and discussing strengths and weaknesses of each organization.  (Id.).  Buchy also used the letter to make yet another request for a five-year plan from Cavcon.  (Id.).

On June 19, 2006, Vaughan sent Buchy a letter that summarized his own interpretation of the conference call on May 31, 2006.  (Vaughan Depo. at 173, attached as Ex. 4 to Defs.' M.S.J.; 06-19-06 Vaughan Ltr. to Buchy, Vaughan Depo. Ex. 45. attached as Ex. 5 to Defs.' M.S.J.).  In his letter to Buchy, Vaughan first stated that he was concerned that the rumor was in fact true, but he was willing to move forward.  (06-19-06 Vaughan Ltr. to Buchy, attached as Ex. A to Pl.'s Resp. to M.S.J., designated EH 33-37).  Vaughan's letter further stated that the sales goals established for the territory were unrealistic. (Id.).  As far as Cavcon's plans for the future, Vaughan indicated that he would provide a five-year plan after Endress agreed to provide realistic sales goals for the West Virginia territory.  (Id.).  He then concluded the letter by stating that he "will not agree to [Endress'] unfair and unrealistic expectations that doom us from that [sic] beginning to certain failure."  (Id.).

22

Previously, on June 6, 2006, Lucey sent Vaughan an e-mail confirming that he had received both certified letters sent by Vaughan in May.  (06-06-06 Lucey e-mail to Vaughan, attached as Ex. A to Pl.'s Resp. to M.S.J.).  Lucey informed Vaughan that Cappelli and Buchy would be handling the matter.  (Id.).  The e-mail concluded with "[w]e have built a lot of momentum with many exciting things taking place.  I do look forward to what the future holds."  (Id.).  Lucey declined to meet with Vaughan and "did not call him back," explaining at his deposition that, "Frank Buchy and Fred Cappelli are in a place to handle those kinds of issues, so I trust them to do that."  (Lucey Depo. at 50, 76, attached as Ex. B to Pl.'s Resp. to M.S.J.).

Vaughan never provided Endress with the five-year plan for which it asked repeatedly. (Vaughan Depo. at 81, 86-87, attached as Ex. 4 to Defs.' M.S.J.).

K. Endress' Simultaneous Decision to Replace Cavcon with Boleky

Meanwhile, on May 8, 2006, Buchy e-mailed Planitzer asking him to put together a business plan for growing the West Virginia territory to 10% market share by 2011 in the event the territory came available.  (Buchy Decl. ¶ 5; 05-08-06 Buchy e-

23

mail to Planitzer, attached as Ex. 11-C to Defs.' M.S.J.).  The market-share target was based on the market data Endress obtained from its consultant.  (<u>Id.</u>).  Buchy included Endress' five-year target for sales based on its market data.  (<u>Id.</u>).

On May 11, 2006, Buchy prepared a memorandum outlining his concerns with Cavcon.  (Buchy Decl. ¶ 4; 05-11-06 Buchy Memo., attached as Ex. 11-B to Defs.' M.S.J.).  Buchy was critical of Cavcon, writing that its attitude and cooperation were poor.  (<u>Id.</u>).  Buchy believed that Cavcon did not offer solutions to improve the territory and increase business and that Vaughan continually sent newspaper clippings to several people at Endress stating how bad the economy is in West Virginia to justify status quo sales.  (<u>Id.</u>).  Buchy further noted that Vaughan made several rude references to Endress' organization, for example criticizing the "idiots who came up with market potential data[.]"  (<u>Id.</u>).  He also noted that Vaughan frequently complained about Endress' commissions paid to Cavcon.  (<u>Id.</u>).  Buchy noted that Cavcon exceeded its target in 2005, but was not on target for the year as of May 2006.  (<u>Id.</u>).  He recounted that Vaughan had complained that the 2006 target was a "pipe dream."  (<u>Id.</u>).

Buchy recommended that Endress: (1) actively look for a replacement representative; (2) develop a plan to transition from Cavcon to a new sales representative for the West Virginia territory; and (3) not spend anymore time discussing these issues with Cavcon as Buchy did not believe that Cavcon's attitude would change.  (<u>Id.</u>).  On May 14, 2006 Buchy e-mailed the memorandum to his boss, Cappelli. (Cappelli Decl. ¶ 3; 05-14-06 Buchy e-mail to Cappelli, attached as Ex. 10-B to Defs.' M.S.J.).

On July 10, 2006, Buchy e-mailed Cappelli again recommending that Endress change its sales representation in the West Virginia territory as soon as possible. (07-10-06 Buchy e-mail to Cappelli, attached as Ex. 10-B to Defs.' M.S.J.). Buchy's stated reasons again included his view that Cavcon does not embrace Endress' sales growth targets in West Virginia and does not feel that they are achievable.  (<u>Id.</u>).  Buchy believed that Cavcon would not invest any more manpower, was uncooperative regarding joint sales planning, lacked focus to sell and promote Endress products and services, had a very cavalier attitude toward Endress, and was not open to ideas and suggestions. (<u>Id.</u>).  Buchy recommended that Endress assign Boleky as its sales representative for the West Virginia territory.  (<u>Id.</u>).

On July 16, 2006, Buchy forwarded to Cappelli Planitzer's top 20 list of customers, together with comments concerning Planitzer's business plan for the West Virginia territory.  (07-16-06 Buchy e-mail to Cappelli, attached as Ex. 10-C to Defs.' M.S.J.).

On July 24, 2006, Buchy e-mailed Planitzer requesting additional information in order for a decision to be made with regard to the West Virginia territory.  (07-24-06 Buchy e-mail to Planitzer, attached as Ex. 11-E to Defs.' M.S.J.).  A response from Planitzer is not in the record.

In late October 2006, Buchy called Planitzer to inform him that the territory would be re-assigned from Cavcon to Boleky.  (Planitzer Depo. at 38-39, 86, attached as Ex. 1 to Defs.' M.S.J.).

L.   Planitzer Contact with Cavcon Employee

Planitzer and David Joe, an employee of Cavcon at the time who principally sold Endress products, rode together in a car from Philadelphia to Pittsburgh sometime in late Spring or early Summer of 2006 on the way to a conference.  (Joe Depo. at 31, attached as Ex. G to Pl.'s Resp. to M.S.J.).  Mr. Joe

26

testified as follows at his deposition:

> Q    Did he [Planitzer] at that time [of the car ride]
>      make any inquiries whether you'd be interested in
>      working for him in West Virginia?
>
> A    I made the assumption when he asked me if I was
>      interested in the territory that that would be in
>      regard to employment.  So I took it as that any
>      way at that point.
>
> Q    But his -- did he say anything other than are you
>      interested in the West Virginia territory?
>
> A    No, sir.

(Id. at 31-32).

In late November 2006, after Cavcon received the termination notice, David Joe called Jay Mershon, the analytical product developer for Endress, to ask whether there was any possibility that Joe could obtain employment with Boleky.  (Joe Depo. at 42-44, attached as Ex. 2 to Defs.' M.S.J.; Mershon Depo. at 12-13, attached as Ex. 3 to Defs.' M.S.J.).  Mershon told Joe to speak with Planitzer.  (Mershon Depo. at 13-14, attached as Ex. 3 to Defs.' M.S.J.).  A few days later, Joe called Planitzer to state his interest in an employment opportunity with Boleky in West Virginia.  (Planitzer Depo. at 72, attached as Ex. 1 to Defs.' M.S.J.; Joe Depo. at 44-45, attached as Ex. 2 to Defs.' M.S.J.; Vaughan Depo. at 97-98, attached as Ex. 4 to Defs.' M.S.J.).  Planitzer asked David Joe some general questions

regarding his employment with Cavcon and his expectations.
(Planitzer Depo. at 72, attached as Ex. 1 to Defs.' M.S.J.; Joe
Depo. at 45-46, attached as Ex. 2 to Defs.' M.S.J.).


II.


Cavcon alleges an eleven-count complaint which includes
the following: Breach of Contract (Count I), Breach of Covenant
of Good Faith and Fair Dealing (Count VI), and Bad Faith Breach
of Contract (Count VII), all of which are solely against Endress;
Negligence (Count II) against Endress, Lucey, Capelli, and
Planitzer; Tortious Interference (Count III) and Conspiracy to
Commit Tortious Interference (Count IV) against Endress,[3] Boleky,
Planitzer, and Cappelli; Breach of Fiduciary Duty (Count V)
against Planitzer; Fraud or Misrepresentation (Count VIII)
against all defendants; and Request for Injunctive Relief (Count
XI) against Endress and Boleky.  (Am. Compl. at 3-10).

In its response to defendants' motion for summary
judgment, Cavcon stated it "hereby stipulates to the dismissal of
Counts IX & X."  (Pl.'s Resp. to Defs.' M.S.J. at 29).  Cavcon

---

[3]  Only Count IV, and not Count III, is alleged against
Endress.

28

seeks summary judgment only on Count I.

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those necessary to establish the elements of a party's cause of action. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. Id. The moving party has the burden of showing -- "that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the movant satisfies this burden, then the non-movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial. Fed. R. Civ. P. 56(c); Id. at 322-23. A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor

of the non-movant.  <u>Williams v. Griffin</u>, 952 F.2d 820, 823 (4th Cir. 1991).

      Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party.  <u>Anderson</u>, 477 U.S. at 248.  Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute.  <u>Overstreet v. Kentucky Cent. Life Ins. Co.</u>, 950 F.2d 931, 937 (4th Cir. 1991).

      A court must neither resolve disputed facts nor weigh the evidence, <u>Russell v. Microdyne Corp.</u>, 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility.  <u>Sosebee v. Murphy</u>, 797 F.2d 179, 182 (4th Cir. 1986).  Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor.  <u>Charbonnages de France v. Smith</u>, 597 F.2d 406, 414 (4th Cir. 1979).  Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."  <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962).

III.

The agreement contains a choice-of-law provision which states that it "shall be construed in accordance with the laws of the State of Indiana." (Agreement, attached as Ex. 1 at 12, ¶ 15 to Reply to Resp. to M.S.J.). Defendants contend the choice-of-law provision designates Indiana law to govern the agreement. (Defs.' Memo. in Supp. of M.S.J. at 17; Defs.' Reply to Resp. to M.S.J. at 3). By contrast, plaintiff states that Endress is incorrect in its choice-of-law analysis and instead appears to suggest that West Virginia law controls all of the counts. (Pl.'s Resp. to Defs.' M.S.J. at 2 n. 1).

When exercising diversity jurisdiction, a federal district court must apply the choice-of-law rules of the state in which it sits. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496 (1941). Accordingly, the conflicts rules of West Virginia apply.

As to the Count I breach of contract claim, "[a] choice of law provision in a contract will not be given effect when the contract bears no substantial relationship with the jurisdiction whose laws the parties have chosen to govern the agreement, or when the application of that law would offend the public policy of this state." Syl. pt. 1, General Electric Company v. Keyser,

31

166 W. Va. 456, 275 S.E.2d 289 (1981); <u>accord</u> <u>American Ins. Co.</u>
<u>v. Frischkorn</u>, 173 F. Supp.2d 514, 518 (S.D. W. Va. 2001); <u>Riffe</u>
<u>v. Magushi</u>, 859 F. Supp. 220, 222 (S.D. W. Va. 1994).

        Though it cites a similar statement in <u>Keyser</u>,
plaintiff does not explain which of the two exceptions it seeks
to invoke.  (Pl.'s Resp. to Defs.' M.S.J. at 2 n. 1).  With
respect to the first exception, Indiana is the physical location
of defendant Endress and is the state in which Endress is
incorporated.  (Compl. ¶ 2; Answer ¶ 2).  The contract thus bears
a substantial relationship to Indiana.  <u>See</u> <u>Bryan v.</u>
<u>Massachusetts Mut. Life Ins. Co.</u>, 178 W. Va. 773, 777, 364 S.E.2d
786, 790 (1987) (choice-of-law provision upheld in part because
Massachusetts had a substantial relationship to the parties
inasmuch as the defendant was a Massachusetts insurance company
and plaintiff sold defendant's insurance in West Virginia).
Consequently, the first exception does not apply.  The second
exception also is inapplicable inasmuch as plaintiff has not
identified any public policy that would be offended by
application of Indiana law.  Accordingly, as to the Count I
breach of contract claim, the choice of law provision in
agreement is valid and Indiana law governs, at least to the
extent it requires the agreement to be construed.[4]

_____

        [4] Though the court applies Indiana law as to Count I, West
Virginia law does not differ from Indiana law in any material
respects in the principles needed for the analysis of Count I.

The remainder of the counts are tort or quasi-tort claims, which do not require an interpretation of the agreement. For these, the court applies the traditional, general choice-of-law principle used in West Virginia of lex loci delicti. See syl. pt. 2, State of West Virginia ex rel. Chemtall Inc. v. Madden, No. 31743, 216 W. Va. 443, 447, 607 S.E.2d 772, 776 (2004) (quoting syl. pt 1, Paul v. National Life, 177 W. Va. 427, 352 S.E.2d 550 (1986)).  "[T]hat is, the substantive rights between the parties are determined by the law of the place of injury."  Id. [216 W. Va. at 451, 607 S.E.2d at 780] (quoting Vest v. St. Albans Psychiatric Hosp., 182 W. Va. 228, 229, 387 S.E.2d 282, 283 (1989)).  Inasmuch as plaintiff contends the harm it has suffered has occurred tangibly in West Virginia, the court applies West Virginia law to Counts II, III, IV, V, VI, VII, VIII, and XI.  See id.

The court need not delve into a conflict-of-laws analysis as set forth in the Restatement (Second) of Conflict of Laws (1971), which may be better suited for more complex issues such as when the harm is suffered outside of West Virginia.  See, e.g., Oakes v. Oxygen Therapy Servs., 178 W. Va. 543, 544-545, 363 S.E.2d 130, 131-132 (1987).

33

IV.

A.   Count I -- Breach of Contract by Endress

The agreement between Endress and Cavcon did not
contain a period of time in which Cavcon would serve as its
representative in the West Virginia territory.  (Agreement,
attached as Ex. 1 to Defs.' Reply to Resp. to M.S.J.).  Rather,
it simply allowed either party to terminate the relationship
"with or without cause on 30 days notice."  (Id.; Pl.'s Resp. to
M.S.J. at 3; Defs.' Memo. in Supp. of M.S.J. at 17).  Paragraph
13 of the agreement specified that Endress would pay, for orders
accepted by it, full commission in the 30-day period following
the effective date of termination and one-half commission for an
additional 30 days.  (Agreement ¶ 13, attached as Ex. 1 to Defs.'
Reply to Resp. to M.S.J.).

As earlier noted, Endress' cancellation addendum, dated
October 30, 2006, stated that the effective termination date
would be November 1, 2006.  (10-30-06 Contract Cancellation
Addendum, attached as Ex. 1 to Pl. M.S.J.).  Cavcon contends (1)
Endress' cancellation addendum breached the agreement's provision
requiring 30 days notice inasmuch as it terminated the
relationship only 2 days after the notice was provided and (2)
the agreement remains in effect because a formal 30-day notice

34

was never given.  (Id.; Pl.'s Memo. in Supp. of M.S.J. at 3-4).

Endress responds that there was not a breach of the 30-day notice requirement because in all practical effect the relationship endured for the necessary 30-day period and as a consequence Cavcon did not suffer any damages, notwithstanding what Endress describes as the "typographical mistake" in the cancellation addendum.  (Defs.' Memo. in Supp. of M.S.J. at 17-18).  According to Endress, in practical effect, the Agreement did not terminate until December 1, 2006, which is the date Boleky assumed responsibility for the territory as was set forth in Endress' notice to potential customers given on November 15, 2006.  (Id. at 17; 11-15-06 Buchy e-mail, attached as Ex. 11-F to Defs.' M.S.J.; Lucey Decl. ¶ 7, attached as Ex. 8 to Defs.' M.S.J.).  Indeed, Endress and Cavcon effectively treated the termination date as November 30, 2006.  Vaughan testified as follows:

> Q   . . . [W]ith respect to orders placed under the
> agreement, including the six month period following the
> termination of the Cavcon and Endress + Hauser
> relationship, did, to your knowledge, Cavcon continue
> to place orders after it received its notice of
> termination from Endress + Hauser?
>
> A   Yes.  We continued to place orders with Endress +
> Hauser during the month of November 2006 and beyond
> that time, there were some orders that were placed, but
> they were minimal and they were placed with the new
> rep.
>
> Q   So after November 2006 they [sic] were some
> minimal orders placed through Boleky?

```
A    Yes.

Q    The, on these orders that were placed through the
month of November 2006 was Cavcon paid its full
commission on those orders?

A    Yes.  They -- yes.
```

(Vaughan Depo. at 47-48, attached as Ex. 3 to Defs.' M.S.J.).

        In the following exchange, Cavcon admits it was paid

full commission for the orders generated by it as contemplated by

the contract.  (Pl.'s Resp. to Defs.' M.S.J. at 5).  The

defendants stated the following in their memorandum:

> Assuming that E+H [Endress] failed to give proper
> notice, it nevertheless made certain that Cavcon was
> not injured by any truncated notice period.  Indeed,
> under the contract, E+H was obligated to pay Cavcon
> full commission on all orders placed within the first
> 30 days after the effective date of the termination,
> which it did.  E+H was also obligated to pay Cavcon
> half commission on all orders placed within days 31 to
> 60 following the termination of the Agreement, but E+H
> did more by paying Cavcon full commission on all of
> Cavcon's post-termination sales.

(Defs.' Memo. in Supp. of M.S.J. at 18).  After quoting this

paragraph verbatim in its response, Cavcon acknowledged,

> [a]lthough Cavcon was paid for all sales made during
> *this* sixty day period, this is not the only period of
> damages for this breach.  The Agreement provided for
> certain actions in the event that either party *properly*
> terminated the Agreement.  This [proper termination]
> did not occur in this matter.

(Pls.' Resp. to Defs.' M.S.J. at 5) (italics in original,

underline added).  Regardless, Cavcon has not asserted that any

commissions earned were unpaid.  It is thus clear that Cavcon's sole basis for the breach was the formal deficiency of the initial written notice in mistating the effective date of termination rather than the course of conduct of the parties in the relevant period of time following the notice.

Lucey's declaration, the accuracy of which Cavcon has not disputed, reiterated that the contractual relationship endured for 30 days following the notice and plaintiff did not suffer damages by averring, "Endress treated the relationship with Cavcon as if it were terminated effective December 1, 2006. Cavcon continued to place orders as the West Virginia representative through November and was paid 100 percent of its commission on all orders it placed."  (Lucey Decl. ¶ 7, attached as Ex. 8 to Defs.' M.S.J.).  As a result, at the end of November 2006, as Vaughan acknowledged, Cavcon was at 99% of its $790,000 target for the year 2006.[5]  (Vaughan Depo. at 147, 158, attached as Ex. 3 to Defs.' M.S.J.).

Consequently, Cavcon's argument is without merit. Cavcon was on notice of Endress' intention to terminate the agreement, when Vaughan received the written cancellation addendum on October 31, 2006.  (Vaughan Depo. at 87, attached as Ex. 4 to Defs.' M.S.J.).  It is undisputed that Cavcon continued

---

[5] The 2006 result appears to have been Cavcon's best performance under its agreement with Endress.

to act in point of fact as Endress' representative for 30 days following receipt of the cancellation addendum and received all commissions to which it was entitled for the ensuing 60-day period following the effective termination date at a rate equal to or exceeding that contemplated by paragraph 13 of the agreement.  "[T]he measure of damages in a contract action is limited to those actually suffered as a result of the breach which are reasonably assumed to have been within the contemplation of the parties at the time the contract was formed."  Erie Ins. Co. v. Hickman, 622 N.E.2d 515, 519 (Ind. 1993) (internal citations omitted).  In a contract without a duration and terminable "with or without cause," the restriction in paragraph 13 was the only amount of damages contemplated by the parties.  Here, those damages are nonexistent because Endress fully performed that portion of the contract by paying the required commissions.  Cavcon thus received the benefit of its bargain with Endress.  Without any damages, the cause of action is devoid of an essential element of a viable breach of contract claim.[6]  See, e.g., Rogier v. Am. Testing Eng'g Corp., 734 N.E.2d

---

[6] Keeping in mind it is undisputed that Cavcon received and understood the cancellation addendum, the following language of the cancellation addendum forecloses Cavcon's argument that a question of fact remains whether the contract was terminated: "After much consideration, Endress + Hauser has elected to terminate CAVCON, Inc. as our representative in the territory . . . . Your effective termination date is November 1, 2006."  (10-30-06 Cover Letter and Cancellation Addendum, attached as Ex. 1 to Pl.'s M.S.J.).

606, 614 (Ind. Ct. App. 2000).

Plaintiff's motion for partial summary judgment, which is only with respect to Count I, is denied, and Endress' motion for summary judgment as to Count I is granted.

> B.    Count II -- Negligence by Endress, Lucey, Cappelli, and Planitzer

Cavcon's response to the motion for summary judgment with respect to Endress, Lucey, and Cappelli essentially raises the following four disputed facts by alleging that those three defendants (1) ignored information sent by Vaughan, (2) refused to meet with Vaughan, (3) failed to understand the business climate in West Virginia (in which Cavcon operated), and (4) concealed information[7] from plaintiff, some of which were in violation of Endress' written credo.  (Pl.'s Resp. to Defs.' M.S.J. at 8-11).

---

[7] The information was "concealed" only in the sense that Buchy and Cappelli did not tell Vaughan about their conversations specifically with Planitzer regarding the replacement of Cavcon with Boleky.  (05-15-06 Buchy e-mail to Lucey and Cappelli, attached as Ex. A to Pl.'s Resp. to M.S.J., identified as EH 0051-0052).  When confronted by Vaughan about a rumor he had heard to that effect, according to Buchy's e-mail to Lucey prior to the termination, Buchy admitted to Vaughan that Endress was considering replacing Cavcon, but he refrained from commenting specifically about Planitzer, telling Vaughan it was none of his business.  (Id.).

39

Because the existence of a duty is dependent upon the foreseeability of harm and because it was foreseeable that defendants' alleged failures in communicating with and supporting Cavcon caused its loss of the sales representative contract, Cavcon argues the defendants owed a duty to plaintiff and a negligence claim is cognizable.  (Id.).  Cavcon's own citation to Strahin v. Cleavenger, 216 W. Va. 175, 185, 603 S.E.2d 197, 207 (2004), demonstrates the problem with its argument.  In relevant part, Cavcon cites the following passage in which the Supreme Court of Appeals of West Virginia quoted the Supreme Court of California.

> [A] court's task -- in determining "duty" -- is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party.
>
> The jury, by contrast, considers "foreseeability" . . . [in] more focused, fact-specific settings . . . . [T]he jury may consider the likelihood or foreseeability of injury in determining whether, in fact, the particular defendant's conduct was negligent in the first place."
>
> Ballard v. Uribe, 41 Cal.3d 564, 224 Cal.Rptr. 664, 715 P.2d 624, 628-29 n. 6 (1986) (emphasis in the original).  Thus, a court's overall purpose in its consideration of foreseeability in conjunction with the duty owed is to discern in general terms whether the type of conduct at issue is sufficiently likely to

40

result in the kind of harm experienced based on the
evidence presented.

Strahin, 216 W. Va. at 185, 603 S.E.2d at 207.  The general
conduct at issue is that of a failed contractual relationship.
It is not of the kind sufficiently likely to result in harm such
that tort liability should be imposed.

       All of the four alleged factual disputes by Cavcon
regarding defendants Endress, Lucey, and Cappelli flow from the
erstwhile contractual relationship between Endress and Cavcon and
any negligence claim on that basis is prohibited.  "'"Tort law is
not designed . . . to compensate parties for losses suffered as a
result of a breach of duties assumed only by agreement.  That
type of compensation necessitates an analysis of the damages
which were within the contemplation of the parties when framing
their agreement.  It remains the particular province of the law
of contracts."'"  Silk v. Flat Top Const., Inc., 192 W. Va. 522,
526, 453 S.E.2d 356, 360 (1994) (internal quotations omitted).
Where the duty is one based solely upon contract, the plaintiff's
remedy is for breach of contract rather than negligence.  See id.
To the extent plaintiff's negligence claim is based on a duty set
forth in the agreement, it fails.

       To the extent the claims against Endress, Lucey, and
Capelli are extra-contractual, no duty exists.  See Aikens v.
Debow, 208 W. Va. 486, 491, 541 S.E.2d 576, 581 (2000).  Absent a

41

special relationship such as that created by contract, there is
ordinarily no duty in tort of one to return another's phone calls
and correspondence, meet with another, understand a state's
business climate, or disclose information, irrespective of
whether the company credo states otherwise.  Id.; see also
Flechsig v. U.S., 991 F.2d 300, 304 (6th Cir. 1993) (allegation
of violation of defendant's internal regulations does not
establish negligence per se); Doe v. U.S., 718 F.2d 1039, 1041
(11th Cir. 1983) (citing Tringali Bros. v. U.S., 630 F.2d 1089
(5th Cir. 1980)) (same).  As Cavcon itself explains, "[n]o action
for negligence will lie without a duty broken."  Syl. pt. 1,
Parsley v. General Motors Acceptance Corp., 167 W. Va. 866, 280
S.E.2d 703 (1981).

       A fifth point raised by Cavcon must be considered
separately because it could create a duty independent of the
contractual relationship.  Plaintiff briefly mentions its
confidential information was misappropriated and given to
Planitzer. (Pl.'s Resp. to Defs.' M.S.J. at 8).  In so stating,
Cavcon cites to a series of seven related pages of documents,
stamped EH 1083 to 1089.  (Id.).  These seven pages consist of a
one-page e-mail from Buchy to Planitzer with the subject line,
"Cavcon Data for Territory; Confidential Information," explaining
that the next attached six pages contain market-share data and
projections for Cavcon and Boleky.  (05-08-06 Buchy e-mail to

Planitzer, attached as Ex. A to Pl.'s Resp. to M.S.J., identified as EH 1083-1089).

According to defendants, "the information E+H [Endress] disclosed to Planitzer about the performance of Cavcon's territory was not Cavcon's 'confidential information' -- it was E+H's information."  (Defs.' Reply to Resp. to M.S.J. at 6). Buchy's declaration indicates that the confidential information was developed by Endress, and Buchy did not view it as information confidential to Cavcon.  (Buchy Decl. ¶ 5, attached as Ex. 11 to Defs. M.S.J.).  There is nothing in the record to contradict Buchy's assertion that Endress developed the information.  There is also no evidence that Cavcon had an agreement with the defendants that information of their sales of Endress's products would be kept confidential.  The court finds a lack of evidence to support Cavcon's suggestion that the information was confidential as to it rather than to Endress.

Moreover, negligence is not the proper theory for such conduct.  Instead, a claim for misappropriation of trade secrets would be the proper vehicle, but it, too, would be unsuccessful inasmuch as the charts cannot be trade secrets, nor is there evidence that any economic value could be obtained from their disclosure or that plaintiff took reasonable steps to protect the alleged confidentiality of the information.  See W. Va. Code § 47-22-1(d)(1)-(2)  .

43

The motion for summary judgment for Count II as to Endress, Lucey, and Cappelli is granted.

Plaintiff's allegations against Planitzer as to Count II are identical to those alleged in Count V where plaintiff seeks to prove a breach of fiduciary duty claim.  The alleged conduct is more properly characterized as a breach of fiduciary claim rather than negligence, and the court considers these allegations in the analysis of Count V below.

C.   Count III -- Tortious Interference by Boleky, Planitzer, and Cappelli

Cavcon contends that Boleky, Planitzer and Cappelli, either collectively or individually, tortiously interfered with the agreement that existed between Cavcon and Endress by engaging in a scheme designed to replace Cavcon with Boleky as the exclusive representative in the West Virginia territory.  (Am. Compl. ¶¶ 27, 30).

"To establish prima facie proof of tortious interference, a plaintiff must show: (1) existence of a contractual or business relationship or expectancy; (2) an intentional act of interference by a party outside that relationship or expectancy; (3) proof that the interference caused the harm sustained; and (4) damages."  Tiernan v.

44

<u>Charleston Area Med. C'tr, Inc.</u>, 203 W. Va. 135, 148-149, 506 S.E.2d 578, 591-592 (1998) (quoting syl. pt. 2, <u>Torbett v. Wheeling Dollar Savings & Trust Co.</u>, 173 W. Va. 210, 314 S.E.2d 166 (1983)); <u>Cutright v. Metropolitan Life Ins. Co.</u>, 201 W. Va. 50, 56 n. 3, 491 S.E.2d 308, 314 n. 3 (1997) (same); syl. pt. 4, <u>Garrison v. Herbert J. Thomas Memorial Hosp. Ass'n</u>, 190 W. Va. 214, 215, 438 S.E.2d 6, 7 (1993) (same).

        Cavcon asserts that the intent element is a jury question and the other elements are indisputable.  (Pl.'s Resp. to M.S.J. at 12).  The Count III defendants do not challenge that Cavcon has made out the <u>prima</u> <u>facie</u> elements of a tortious interference claim under West Virginia law.  (Int. Pretr. Order at 13).

        Instead, the three defendants argue initially that it "may be appropriate" to apply Indiana law.  (<u>Id.</u>).  Under Indiana law, "disinterested malevolence" of a defendant must be shown for a successful tortious interference claim.  <u>Bilimoria Computer Sys., LLC v. America Online, Inc.</u>, 829 N.E.2d 150, 156-157 (Ind. Ct. App. 2005); <u>Winkler v. V.G. Reed & Sons, Inc.</u>, 638 N.E.2d 1228, 1234 (Ind. 1994)).  As explained previously, however, West Virginia law applies to Count III and, to date, the Supreme Court of Appeals of West Virginia has not specified such a requirement.

Cavcon alleges two bases for its tortious interference claim against Cappelli.  (Pl.'s Resp. to M.S.J. at 13).  The first was a conversation that took place after a Rep Council meeting in the Indianapolis airport in 2005 or 2006 in which Cappelli inquired as to Planitzer's interest in Cavcon's territory.  (Cappelli Depo. at 7-14, attached as Ex. C to Pl.'s Resp. to M.S.J.).  The second involved Cappelli's prior relationship with Boleky in an attempt to suggest that Cappelli benefitted financially from the replacement of Cavcon with Boleky because of his father-in-law's sale of Staples' territory to and subsequent employment with Boleky.  (Pl.'s Resp. to M.S.J. at 13).

Cappelli first responds he cannot be liable for tortious interference, or conspiracy to commit it, as an agent of Endress, which was a party to the contract.  (Defs.' Memo. in Supp. of M.S.J. at 21-22).  It is axiomatic that a party to a contract may not interfere with its own contract, particularly when it can terminate it without cause.  See Rao v. Rao, 718 F.2d 219, 225 (7th Cir. 1983).  It is claimed by Cappelli that his job included reviewing sales representatives in his area, of which the West Virginia territory was a part.  (Defs.' Memo. in Supp. of M.S.J. at 22).

Cavcon counters that, if Capelli were acting outside of the scope of his authority as an agent of Endress, (Pl.'s Resp.

to M.S.J. at 14 n. 5), he could be liable for interference with
the contract.  See, e.g., Malik v. Carrier Corp., 202 F.3d 97,
109 (2d Cir. 2000) (internal citations omitted) (under
Connecticut law, an agent of the contracting party can be held
liable for tortious interference if he does not act legitimately
within the scope of his duty but used the corporate power
improperly for personal gain).

        There is no evidence that Cappelli acted outside the
scope of his authority.  Indeed, Lucey, the president of Endress,
ratified his conduct in soliciting Planitzer.  For example, an
administrative assistant sent the cover letter and cancellation
addendum, of which the cover letter indicated to Vaughan to do
the following: "Please sign both copies and return them to me.
After Todd [Lucey] signs them, I will return one copy to you for
your contract file."  (10-30-06 Cover Letter, attached as Ex. 1
to Pl.'s M.S.J.).

        Any suggestion that there is a factual dispute
regarding Cappelli's tortious interference because he might
benefit financially, which Cappelli denies, must fail given there
is no evidence that his actions in speaking to Planitzer were not
in furtherance of his managerial duties and were outside the
scope of his authority as an agent of Endress.  See Malik, 202
F.3d at 110 (actions taken by manager of contracting party for
his own benefit were insufficient to submit to jury in action for

47

tortious interference against him because they were in
furtherance of his duties as manager).  This claim against
Cappelli is dismissed.

With respect to Boleky and Planitzer, the two
defendants argue that the affirmative defense of justification
applies under West Virginia law.  (Integ. Pretr. Order at 13).

> If a plaintiff makes a prima facie case, a defendant
> may prove justification or privilege, affirmative
> defenses.  Defendants are not liable for interference
> that is negligent rather than intentional, or if they
> show defenses of legitimate competition between
> plaintiff and themselves, their financial interest in
> the induced party's business, their responsibility for
> another's welfare, their intention to influence
> another's business policies in which they have an
> interest, their giving of honest, truthful requested
> advice, or other factors that show the interference was
> proper.

Syl. pt. 4, Garrison, 190 W. Va. 214, 438 S.E. 2d 6, (1993)
(quoting syl. pt. 2, Torbett, 173 W. Va. 210, 314 S.E.2d 166
(1983)).  According to Boleky and Planitzer, their "interest in
taking over the remaining West Virginia territory was centered in
business competition."  (Defs.' Memo. in Supp of M.S.J. at 24).
Legitimate competition with plaintiff is an enumerated
permissible justification for interfering with a contract.  Syl.
pt. 4, Garrison, 190 W. Va. 214, 438 S.E. 2d 6; syl. pt. 2,
Torbett, 173 W. Va. 210, 314 S.E.2d 166.

Torbett notes that further sections of the Restatement
set out factors by which to determine the propriety of

48

justifications, including competition (§ 768).  173 W. Va. at 215-216, 314 S.E.2d at 171-172.  After listing the Restatement factors, <u>Torbett</u> explained, "[w]e have relied upon the Restatement for guidance in outlining elements of and defenses to improper interference but, of course, are not tied to its categories and definitions."  <u>Id.</u> 173 W. Va. at 216, 314 S.E.2d at 172.  The Restatement (Second) of Torts, § 768 provides as follows:

> Competition as Proper or Improper Interference.
>
> (1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if
>
> > (a) the relation concerns a matter involved in the competition between the actor and the other and
> >
> > (b) the actor does not employ wrongful means and
> >
> > (c) his action does not create or continue an unlawful restraint of trade and
> >
> > (d) his purpose is at least in part to advance his interest in competing with the other.
>
> (2) The fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interference if the contract is not terminable at will.

<u>Id.</u> 173 W. Va. 210, 216, n. 13, 314 S.E.2d 166, 172 n. 13.

Because the contract is terminable at will, subsections (1)(a) through (d) may be considered.  Inasmuch as the

competition between Cavcon and Boleky, with Planitzer as its
president, is self-evident, (1)(a) is satisfied.  (See Am. Compl.
¶ 27).

          In making all reasonable assumptions in the plaintiff's
favor as the non-movant, the court nevertheless finds (1)(b) and
(c) are fulfilled as neither Boleky or Planitzer has employed any
wrongful means or created an unlawful restraint of trade.  The
offhand conversations in 2002 and 2003, the contacts Planitzer
had with Endress such as the airport conversation in 2005 and
correspondence in 2006, for which plaintiff chastises Planitzer,
were initiated by Endress or its personnel.  (Planitzer Depo. at
33-34, 42, 52-53, 62-65 attached as Ex. 1 to Defs.' M.S.J. and as
Ex. F to Pl.'s Resp. to M.S.J.).  The two conversations Planitzer
had with David Joe, one of which occurred after Endress' decision
to terminate Cavcon, were harmless and not wrongful means in
Boleky's competition with Cavcon.  (Joe Depo. at 31-32, 42-44,
attached as Ex. 2 to Defs.' M.S.J.).  Likewise, Planitzer's
advertisement in Spring 2006 in West Virginia for an employee
does not constitute wrongful means.  (Planitzer Depo. at 33-34,
42, 52-53, 62-65 attached as Ex. 1 to Defs.' M.S.J. and as Ex. F
to Pl.'s Resp. to M.S.J.).  Another charge by the plaintiff that
Endress edited Planitzer's five-year plan for him, (Pl.'s Resp.
to M.S.J. at 14), says nothing about the conduct of Planitzer.

With respect to (1)(d), Boleky and Planitzer's purpose was clear.  Any of the discussions cited by the plaintiff were obviously done to compete with and ultimately replace Cavcon as the representative in the West Virginia territory.  (See 05-31-06 Planitzer Ltr. to Buchy, attached as Ex. 9-A to Defs.' M.S.J.; 06-26-06 Planitzer Ltr. to Buchy, attached as Ex. 9-B to Defs.' M.S.J.).  Boleky and Planitzer have satisfied the Restatement definition of a justification defense for purposes of competition.

The court accepts Boleky and Planitzer's satisfaction of the Restatement test and finds the affirmative defense of justification is present.  See Torbett, 173 W. Va. at 215-216, 314 S.E.2d at 171-172.  Count III is dismissed as to all three defendants.

> D.    Count IV -- Conspiracy of Endress, Lucey, Cappelli, and Planitzer to Commit Tortious Interference

Under West Virginia law, a civil conspiracy is defined as a combination of two or more persons, by concerted action, to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by unlawful means.  Dixon v. American Industrial Leasing Co., 162 W. Va. 832, 834, 253 S.E.2d 150, 152

51

(1979).  Without an individual tortious inference claim, there cannot be a conspiracy to commit such an act.

>    E.    Count V -- Breach of Fiduciary Duty against
>          Planitzer

As a preliminary matter, the question is raised whether Planitzer owed a duty to plaintiff in his capacity as Cavcon's representative on the Rep Council.  (Defs.' Memo. in Supp. of M.S.J. at 26-27; Defs.' Reply to Resp. to M.S.J. at 12-13).  The initial query of whether a duty exists is guided by two principles set forth by the Supreme Court of Appeals of West Virginia.

The parties appear to agree to the first principle, which is that in order for one to have a fiduciary duty to another, there must be a disparity of position or bargaining power between the two parties involved.  Elmore v. State Farm Mut. Ins. Co., 202 W. Va. 430, 435, 504 S.E.2d 893, 898 (1998).  The second principle is that, "[a] cause of action for breach of fiduciary duty requires proof of fraud, breach of trust or an action outside the limits of the fiduciary's authority."  State ex rel. Affiliated Construction Trades Foundation v. Vieweg, 205 W. Va. 687, 701, 520 S.E.2d 854, 868-869 (Workman, J. concurring).  While the parties spend considerable time in the briefing over the application of these two guiding principles and

whether a duty exists at all, (Defs.' Memo. in Supp. of M.S.J. at 26-27; Pl.'s Resp. to M.S.J. at 17-18; Defs.' Reply to Resp. to M.S.J. at 12-13), Count V can be dealt with by assessing whether the alleged breach was within the scope of the alleged duty Planitzer owed to Cavcon.  Even assuming Planitzer had a duty to Cavcon as its regional representative on the Rep Council, the scope of the duty was limited to the business of the Rep Council.

The Rep Council is focused on products for sale, product delivery, product development, and marketing, (Planitzer Depo. 56, attached as Ex. 1 to Defs.' M.S.J., Lucey Decl. ¶ 6, attached as Ex. 8 to Defs.' M.S.J.), and did not deal with representative contracts or territories.  (Planitzer Depo. 58, attached as Ex. 1 to Defs.' M.S.J., Lucey Decl. ¶ 6, attached as Ex. 8 to Defs.' M.S.J.).  The Rep Council members are not agents of the other sales representatives in their respective regions and do not speak for them with respect to contractual or commercial matters.  (Lucey Decl. ¶ 6, attached as Ex. 8 to Defs.' M.S.J.).  Plaintiff has not disputed Planitzer's deposition testimony or Lucy's declaration with respect to the Rep Council's function.

Planitzer asserts Planitzer was not acting as Vaughan's agent during his time on the Rep Council.  (Defs.' Memo. in Supp. of M.S.J. at 27).  Indeed, Cavcon's complaint does not relate to Planitzer's performance with respect to those duties on the

council.   Cavcon objects to Planitzer's competition and eventual replacement of it as sales representative, not Planitzer's representation of it on the Rep Council.  (Pl.'s Resp. to M.S.J. at 10).  It is contended by Cavcon that, as its council representative, "Planitzer was acting in a position of trust and loyalty to Cavcon.  Thus, Planitzer had a duty to act as a reasonably prudent person would in the same situation."  (Id.). Cavcon concludes, "[a] reasonable counsel [sic] representative would not attempt to obtain the rights to his constituent's territory."  (Id. at 11).

Because Cavcon's objection to Planitzer's conduct is with his taking over the territory rather than his representation on the Rep Council, there can be no claim inasmuch as that conduct is beyond the scope of any duty that may exist.  Count V and the portion of Count II alleged against Planitzer are accordingly dismissed.

    F.    Count VI --  Breach of Covenant of Good Faith and
          Fair Dealing against Endress

Citing Miller v. Massachusetts Mut. Life Ins. Co., 193 W. Va. 240, 244, 455 S.E.2d 799, 803 (1995), Endress first contends that West Virginia law does not recognize an implied covenant of good faith and fair dealing in contracts terminable at will.  (Defs.' Memo. in Supp. of M.S.J. at 27).

54

While <u>Miller</u> does so hold, Cavcon responds that <u>Miller</u> deals with an employment contract and should be limited to that basis. (Pl.'s Resp. to M.S.J. at 19). Assuming Cavcon is correct about the limited application of <u>Miller</u>, its claim nevertheless fails.

In support of its argument that defendants breached the duty of good faith and fair dealing, Cavcon states the following: (1) Endress spoke with Planitzer well in advance of the termination of the agreement and provided information to Planitzer to assist him in securing the West Virginia territory; (2) Lucey, as general manager of Endress, refused to meet with Vaughan, and (3) Endress made its decision to terminate the contractual relationship "at least as early as May 24, 2006" and did so "behind the back of Cavcon." (<u>Id.</u> at 21-22).

Neither of these three assertions provide a basis for a good faith and fair dealing claim given the ability of Endress to terminate the contract without cause at any time. Endress' assistance to Planitzer, Lucey's refusal to meet with Vaughan, and the date Endress decided it would terminate the relationship add nothing to the loss Cavcon would in any event suffer as a result of the termination of the agreement. Indeed, Cavcon likely benefitted from Endress' decision to continue the relationship after it had decided to replace Cavcon with Boleky.

55

Because there were no damages, there can be no actionable breach of the duty of good faith and fair dealing claim.  See, e.g., Williams v. Astra USA, Inc., 68 F. Supp.2d 29, 38 (D. Mass. 1999).

Moreover, though it found that a misnamed breach of the duty of good faith and fair dealing claim was more properly characterized as a breach of contract claim, the Supreme Court of Appeals of West Virginia has

> recognize[d] that it has been held that an implied covenant of good faith and fair dealing does not provide a cause of action apart from a breach of contract claim, Stand Energy Corp. v. Columbia Gas Transmission, 373 F. Supp.2d 631, 644 (S.D. W. Va. 2005), and that '[a]n implied contract and an express one covering the identical subject matter cannot exist at the same time,' syl. pt. 3, in part, Rosenbaum v. Price Construction Company, 117 W. Va. 160, 184 S.E. 261 (1936) . . . ."

Highmark West Virginia, Inc. v. Jamie, 655 S.E.2d 509, 514 (W. Va. 2007).  This district court in Stand Energy found that, although there were no cases directly on point, the law does not recognize such a claim.  373 F. Supp. at 644.  While Highmark did not have occasion to go that far, the court concluded that, to the extent the three reasons for breach of the duty articulated above are part of the performance of the contract, which the latter two appear to be, they are subsumed by the now-dismissed breach of contract claim in Count I.  655 S.E.2d at 514.

It is also noted that Cavcon relies in part on <u>Krypton Coal Corp. v. Golden Oak Min. Co.</u>, 181 W. Va. 405, 408, 383 S.E.2d 37, 40 (1989), for its argument that a claim of good faith and fair dealing is cognizable here.  (Pl.'s Resp. to M.S.J. at 19; Prop. Integr. Pretr. Order at 17).  The relevant portion of <u>Krypton Coal</u> is best summed up by its first syllabus point, which states as follows:

> Under the law of Kentucky, in construing a contract
> providing that performance "shall continue for two
> years thereafter until the 1st day of August, 1985 or
> until Contractor has mined the recoverable coal from
> the premises as determined in Owner's sole judgment . .
> . ," it is the good faith judgment of the owner that
> governs the termination date.

Syl. pt. 1, <u>Krypton Coal</u>, 181 W. Va. 405, 383 S.E.2d 37.  The discussion of good faith in <u>Krypton Coal</u>, applying Kentucky law, states that a party vested with discretion in the contract must exercise that discretion reasonably rather than arbitrarily and capriciously.  <u>Id.</u> 181 W. Va. at 408 n. 2, 383 S.E.2d at 40 n. 2. Nowhere in <u>Krypton Coal</u> does the Supreme Court of Appeals hold that a breach of the duty of good faith and fair dealing exists independent of a breach of contract claim.  Count VI is dismissed.

> G.    Count VII --  Bad Faith Breach of Contract by
>       Endress

If there is no breach of contract resulting in damages

57

generally, there cannot be a successful bad faith breach of
contract claim.  Accordingly, Count VII is also dismissed.

> H.  Count VIII -- Fraud or Misrepresentation against
> all defendants

        To succeed on its claim for fraud or misrepresentation,
the parties agree in the proposed pretrial order, (Integr. Prop.
Pretr. Order at 10, 15), that Cavcon needs to meet the following
elements: (1) that the act claimed to be fraudulent was the act
of the defendant or induced by him; (2) that the act was material
and false, and that plaintiff relied upon it and was justified
under the circumstances in relying upon it; and (3) that the
plaintiff was damaged because of this reliance.  Syl. pt. 5, <u>Kidd</u>
<u>v. Mull</u>, 215 W. Va. 151, 595 S.E.2d 308 (2004); syl. pt. 1,
<u>Lengyel v. Lint</u>, 167 W. Va. 272, 280 S.E.2d 66 (1981).

        Cavcon contends that all of the defendants
misrepresented or concealed information regarding (1) Cavcon's
sales statistics; (2) market share data for the territory; (3)
the defendants' conversations relating to whether Boleky should
replace Cavcon; (4) the referral of Cavcon employee David Joe to
Planitzer; (5) defendants' willingness to resolve disputes with
Cavcon; and (6) defendants' future plans, including the
replacement of Cavcon with Boleky, (Pl.'s Resp. to M.S.J. at 25-
26; Integr. Pretr. Order at 17), each of which allegedly provide

a basis for a cognizable fraud claim.  These contentions seem to coalesce around Cavcon's claim that it was "strung along" by the defendants while there was "no intent . . . to continue the relationship."  (Integr. Prop. Pretr. Order at 17).

Cavcon did not rely upon the first two contentions. (Vaughan Depo. at 77, 159, 163-164, attached as Ex. 4 to Defs.' M.S.J.; Selby Depo. Ex. 9).  Indeed, it contradicted the first two with its own findings.  (Id.).  While Cavcon may have relied upon some of the other six contentions above, any such reliance did not damage Cavcon.  If anything, Cavcon's reliance benefitted it.  Endress had the right under the contract to terminate it on 30 days notice at any time without cause.  (Agreement ¶ 13(a), attached as Ex. 1 to Defs.' Reply to Resp. to M.S.J).  Even assuming Endress was untruthful about its future plans to terminate the relationship with Cavcon, its failure to do so benefitted Cavcon because the relationship endured, though that was not necessitated by their contract.

An essential element of a fraud claim is that the reliance of the plaintiff upon the defendant's misconduct must damage the plaintiff.  See Syl. pt. 5, Kidd, 215 W. Va. 151, 595 S.E.2d 308; syl. pt. 1, Lengyel, 167 W. Va. 272, 280 S.E.2d 66. Even if there were reliance, it could not be said to have damaged the plaintiff.  Consequently, defendants' motion as to Count VIII is granted.

I.   Count XI -- Request for Injunctive Relief against
     Endress and Boleky


Citing W. Va. Code § 11-12C-1, et seq., and W. Va. Code
§ 31E-14-1401, et seq., Cavcon alleges Endress and Boleky are
engaging in business in West Virginia without paying the
appropriate taxes to the State and obtaining the appropriate
business license from the West Virginia Secretary of State.  (Am.
Compl. ¶¶ 66-70).  In addition to making substantive arguments,[8]
Endress and Boleky respond that Cavcon has no standing to bring
this claim.  (Defs.' Memo. in Supp. of M.S.J. at 33).  Cavcon
acknowledges there is no private cause of action in either of the
two statutes cited.  (Pl.'s Resp. to M.S.J. at 29).  Cavcon
provides no other basis for bringing this claim other than to
state "a West Virginia court would have the authority to enforce
West Virginia law . . . ."  (Id.).  Inasmuch as no basis for
standing has been presented, Count XI is dismissed.

---

[8]  Endress and Boleky argue, first, that W. Va. Code § 31E-
14-1401, et seq. applies only to non-profit organizations, which
Cavcon does not dispute, and second, the two defendants are not
"doing business" in West Virginia, as the term is defined in W.
Va. Code § 11-12C-1, et seq., according to Planitzer's account of
his conversation with the Secretary of State's Office.  (Defs.'
Reply to Resp. to M.S.J. at 16-17; Planitzer Depo. at 12-13,
attached as Ex. 9 to Defs.' M.S.J.).

V.

It is, accordingly, ORDERED as follows:

1.    The motion of the plaintiff for partial summary
      judgment as to Count I be, and it hereby is,
      denied;

2.    The motion of the defendants for summary judgment
      be, and it hereby is, granted as to all Counts;
      and

3.    This civil action, in its entirety, be, and it
      hereby is, dismissed with prejudice as to all
      parties and stricken from the court's active
      docket.

The Clerk is directed to forward copies of this
memorandum opinion and order to all counsel of record.

                    DATED: May 8, 2008

                    _____
                    John T. Copenhaver, Jr.
                    United States District Judge

61